IVES LABORATORIES, INC., Plaintiff,

v.

DARBY DRUG CO., INC., Inwood Laboratories Incorporated, MD Pharmaceutical Company, Inc., Premo Pharmaceutical Company, Inc., Rugby Laboratories, Inc., and Sherry Laboratories Co., Inc., Defendants.

No. 78 C 372.

United States District Court,
E. D. New York.

April 15, 1980.

Rogers, Hoge & Hills, New York City (Marie V. Driscoll, Charles J. Raubicheck, Egon E. Berg, Steven J. Baron, New York City, of counsel), for plaintiff.

Salon, Bloustein & Raybin, New York City (Robert V. Marrow, New York City, of counsel), for defendants Darby, Rugby, Sherry & MD.

Kirschstein, Kirschstein, Ottinger & Cobrin, P.C., New York City (Peter T. Cobrin, New York City, of counsel), for defendant Premo.

Bass, Ullman & Lustigman, New York City (Steven R. Trost, New York City, of counsel), for defendant Inwood.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Ives Laboratories, Inc. ("Ives"), which makes and sells the prescription drug

cyclandelate under the registered trademark Cyclospasmol, brought this action seeking an injunction against defendants; manufacturers or wholesalers of generic cyclandelate. Ives claims violations of the Trademark Act of 1946, as amended, (the "Lanham Act"), 15 U.S.C. §§ 1051ff., and of New York statutory and common law. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

On Ives' motion for a preliminary injunction this court temporarily enjoined defendant Sherry Pharmaceutical Co., Inc. ("Sherry") from using the name Spasmol, but otherwise denied Ives temporary relief, 455 F.Supp. 939 (D.C.N.Y.1978), and the Court of Appeals affirmed, 601 F.2d 631 (2d Cir. 1979). The case was then tried to the court. Familiarity with the prior opinions is assumed.

I

The drug cyclandelate, a white powder, is a peripheral vasodilator claimed to produce an increase in blood flow and thereby inhibit the progressive conditions caused by certain vascular diseases which tend to occur in the aged. Cyclandelate is therefore prescribed for a long period of time, generally for the rest of the patient's life. For some years Ives, its predecessors and its parent company American Home Products Corporation have sold the drug under the mark Cyclospasmol, and until the patent on cyclandelate expired in April 26, 1972, had the exclusive right to make and sell the drug in the United States. Ives has been marketing 200mg. dosages in a pale blue capsule imprinted "Ives 4124" since 1962, and 400mg. dosages in a red and blue capsule imprinted "Ives 4148" since 1975.

Because the drug may be dispensed only on prescription, Ives has directed its considerable advertising and promotion not to the general public but primarily to physicians. Some two hundred and thirty so-called "detail" men have made personal visits to doctors distributing numerous samples and various promotional materials. Advertising and promotional expenses have been in excess of $10,000,000. Ives' sales of the drug since 1962 have exceeded $106,000,000.

Of the defendants remaining in the case three are manufacturers, namely, Premo Pharmaceutical Laboratories, Inc. ("Premo"), Inwood Laboratories, Incorporated ("Inwood"), and MD Pharmaceutical Company, Inc. ("MD") (collectively "the manufacturers"). All three purchase cyclandelate powder and empty capsules and assemble the product for sale to wholesalers and hospitals. Inwood and MD also sell to retail pharmacies. Premo and Inwood sell 200mg. and 400mg. capsules in colors identical to those used by Ives. MD does the same with 200mg. capsules. Since the action was brought, Premo has imprinted the word Premo on its capsules and Inwood has imprinted "NDC 258" on its capsules. MD sells capsules bearing no imprint. Defendants Darby Drug Co., Inc. ("Darby"), Rugby Laboratories, Inc. ("Rugby"), and Sherry (collectively "the wholesalers") purchase capsules of the kind made by the manufacturers and sell them primarily to physicians and pharmacies.

All the defendants promote the generic product as "comparable" or "similar" or "equivalent" to Cyclospasmol, and in some catalogs refer to the color of the capsules. Defendants' cyclandelate contains the same active ingredient as Cyclospasmol, and Ives offered no proof at the trial that defendants' product had a therapeutic effect different from that of Cyclospasmol.

Sherry had offered the drug under the name Spasmol, but abandoned that name prior to the motion for a preliminary injunction. The remaining defendants do not sell under a brand name.

Ives sells to druggists and wholesalers in packages identifying its name and displaying the trademark Cyclospasmol. Pharmacists then dispense the capsules in smaller bottles with their own labels. In New York State the New York Drug Substitution Law spells out the pharmacist's duty. Section 6810(6) of the Education Law requires the prescription form to recite that it will be filled generically unless the doctor signs over the line stating "dispense as written".

The other line which must appear on the form reads "substitution permissible". If the doctor signs over that line, Section 6816–a(1) requires the druggist to "substitute a less expensive drug" having the same active ingredients provided it appears on a list established under the New York Health Law. If the drug is not on the list, as cyclandelate is not, the druggist may but need not substitute the less expensive drug.

Unless the physician otherwise directs, the pharmacist must include on the label the strength of the drug and its brand name, if it has one, or, if it is sold under the generic name, that name and the name of the manufacturer. Thus, for example, if dispensing a 200mg. dosage of Ives' product the pharmacist should state on the label, "Cyclospasmol 200mg.", or, if dispensing Premo's product, "Cyclandelate 200mg. Premo".

Ives' chief objective in this action is to prohibit defendants from marketing cyclandelate in capsules of the same blue and blue and red colors as Ives uses.

## II

There is no reason why the temporary injunction against Sherry prohibiting use of the name "Spasmol" should not be made permanent.

## III

Ives' claim that defendants are guilty of contributory infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114, was not proven. The court finds that defendants did not suggest, even by implication, that pharmacists fill bottles with the generic drug cyclandelate and apply the trademark Cyclospasmol. Nor did Ives show that defendants continued to sell the generic drug to pharmacists who defendants knew or had reason to know were engaging in such a practice. 601 F.2d at 636.

Defendants do not "detail" their products by making personal visits to pharmacists, and defendants' names appear on their packages of cyclandelate capsules. There-fore any suggestion by defendants that pharmacists mislabel must be found in defendants' catalogs and promotional materials. These materials cannot fairly be read as suggesting to druggists that they affix Ives' mark to bottles containing defendants' capsules.

Moreover, such incidents of mislabeling as were proven were not shown to have been induced by defendants. There was no proof of illegal substitution accompanied by mislabeling beyond the few instances referred to on the motion for a preliminary injunction. Ives did offer evidence at trial of a few instances of legal substitution where the word Cyclospasmol was improperly used on the label. Some Ives test shoppers gave a prescription for Cyclospasmol signed on the line over "substitution permissible" to forty-two pharmacists in New York selected from a list supplied by Ives and forty-one from a list of drug stores in Hayes Directory. Of the forty-two on the Ives list twenty-four dispensed Cyclospasmol, and eighteen dispensed the generic product. Six of those eighteen included the word Cyclospasmol on the label. Of the forty-one on the Hayes Directory list twenty-four dispensed Cyclospasmol and seventeen dispensed the generic product. Four of those seventeen included the word Cyclospasmol on the label.

Of the total of ten pharmacists who dispensed generic cyclandelate and also used the word Cyclospasmol on the label, four used the term "generic Cyclospasmol" or "Cyclospasmol generic" and one the term "Cyclospasmol Gen." Nine of the ten informed the person buying the capsules that the generic product had been dispensed. Only one appears to have charged a higher "brand" price. This evidence hardly justifies an inference that defendants' catalogs impliedly invited druggists to mislabel.

To the extent the druggists who were test shopped by Ives mislabeled they appear not deliberately to have been attempting to pass off the generic product as Cyclospasmol but rather to have misunderstood the precise requirements of the New York Drug Substitution Law. Indeed, the misunder-

standing of the law is confirmed by the numerous instances in which pharmacists dispensed Cyclospasmol and, although a generic substitution was permitted by the prescription, erroneously stated to the person presenting the prescription that New York law prohibited them from filling it with a generic product.

■ In accordance with the direction of the Court of Appeals this court has considered whether Ives should have limited relief of the sort mentioned in *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 532–33, 44 S.Ct. 615, 618, 68 L.Ed. 1161 (1924). The court has concluded that it would not be useful to require defendants to recite on their packages that the product is not to be dispensed as Cyclospasmol. Defendants' packages do not represent that they contain Cyclospasmol, and the evidence shows that druggists are well aware of the difference between the brand and the generic product. As noted above, any mislabeling stemmed from doubt as to the requirements of the generic drug law, not from inducement by defendants. Statements on defendants' packages are hardly likely to deter those isolated instances of deliberate and fraudulent substitution by pharmacists. Perhaps recourse to the civil and criminal penalties available will do so.

Nor would it be fruitful to require all defendants to print their names on the capsules. The evidence showed that the capsules are so small that such an imprint would be of little if any value.

The court holds that plaintiff is not entitled to relief against defendants for contributory infringement of the trademark Cyclospasmol.

## IV

■ Ives' chief claim is that defendants are violating Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). That section provides, in pertinent part, that one who uses in connection with goods "a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent" the goods shall be liable in a civil action to "any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

Ives contends first that it was "false" for defendants to promote their product as "comparable" or "equivalent" to Cyclospasmol. This claim was not proven. Indeed, Ives offered no evidence on the point and admitted that defendants' product has the same active ingredient as Cyclospasmol.

Ives' most serious contention is that defendants' use of the blue and blue and red colors is "a false designation of origin" or a "false description or representation" of defendants' product and that Ives should therefore have the exclusive use of those colors in selling cyclandelate. This court must follow the Court of Appeals' holding, 601 F.2d at 639–42, as to *Sears, Roebuck & Co. v. Stiffel Company*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), and accordingly considers whether or not the colors are "functional" and, if they are not, whether they have acquired a "secondary meaning" so as to justify Ives having a monopoly over them.

The Court of Appeals quoted, 601 F.2d at 642–43, as a "good statement of the law" an excerpt from *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343 (9th Cir. 1952). That quotation recites that the word "functional" connotes other than a trademark purpose and that "[i]f the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits its imitation in the absence of a patent or copyright."

The court finds that the colors are functional in several respects. First, many elderly patients associate the appearance of their medication with its therapeutic effect. There was testimony that some patients refuse to take equivalent drugs of a different color despite explanation of the equivalence by their doctors. Other patients eventually accept equivalent drugs of a different appearance if their physician assures

them that the prescription was filled correctly but are caused considerable anxiety and confusion by the change. When patients associate the drug with its therapeutic effect in this manner, to insist that defendants use a different color would unjustifiably put them at a competitive disadvantage. Thus color is an important ingredient in the commercial success of the product.

Second, some patients co-mingle their drugs in a single container and then rely on the appearance of the drug to follow their doctors' instructions. One doctor testified that he prepares a chart using the color and shape of the medication to help disoriented and forgetful patients avoid confusion between several drugs. While this practice is not universal, clearly some doctors use the appearance of a drug in communicating with their patients and in assisting them to take the correct medications at the appropriate times.

Third, to some limited extent color is also useful to doctors and hospital emergency rooms in identifying overdoses of drugs. There was testimony that the color of a capsule provides one clue in an often difficult and hurried effort to determine what a patient has ingested.

The functional aspect of the color of the capsules is further evidenced by the fact that the parent of Inwood discontinued sale of cyclandelate in a green capsule because the different color was not accepted by hospitals, pharmacies and wholesalers in the light of the potential for confusion. One hospital official testified that he refused to purchase cyclandelate in a green capsule.

A different situation would be presented if wholesalers, pharmacies and hospitals insisted on purchasing generic cyclandelate in colors identical to those of Ives so that they could unlawfully pass off the generic product as that of Ives. But nothing in the record suggests such a motive. The fact is that, not surprisingly, the colors have come to represent to large numbers of those taking cyclandelate not its source but its ingredients and their effects. The colors are thus functional to the patients as well as to doctors and hospitals.

But even if the colors are not functional in the sense intended by the Court of Appeals, Ives failed to show that the colors indicate sponsorship or origin and have therefore acquired a secondary meaning.

█ To establish secondary meaning a plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). As the Court of Appeals indicated, 601 F.2d at 643, in quoting from *Waltham Watch Co. v. United States Watch Co.*, 173 Mass. 85, 87, 53 N.E. 141, 142 (1899) (Holmes, J.), "a color in connection with a sufficiently complex combination of other things may be recognized as saying so circumstantially that the defendant's goods are the plaintiff's as to pass the injunctive line." *See also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203–204 (2d Cir. 1979). But the colors must "say" that "the defendant's goods are the plaintiff's," in other words, must convey the message not merely that the goods have the same active ingredients and effect but that they are in fact the plaintiff's goods. In short, in order to establish secondary meaning Ives must demonstrate that patients suppose that the blue and blue and red colors indicate the source, albeit the anonymous source, of the drug and not its chemical ingredients or its function.

Doctors are, of course, well aware that generic and brand name drugs come from different sources. Ives did not contend that in deciding on a prescription doctors were confused by the identical colors. Rather Ives sought to establish that the colors had a secondary meaning to the patient.

Ives failed to do this. The doctors who testified believed that patients do not associate the appearance of a drug capsule with the manufacturer or other source but with the drug's effect on the patient's disability. Patients tend to identify capsule colors with

their ailments, for example, "my red heart pill". Ives made no showing that any patient took the colors to mean that the drug came from a particular source.

Ives offered testimony as to a survey said to be relevant to secondary meaning. Those taking the survey refused to reveal the identity of the actual interviewers or those interviewed. There was thus no way in which the defendants could test the trustworthiness of the results. For this reason the court would in any event accord the survey very little weight. But even assuming that the survey's techniques were sound (as to which the court does not express an opinion), the survey did not constitute proof that the colors had acquired a secondary meaning.

Thirty-six patients who were taking the blue or blue and red Cyclospasmol capsules were interviewed. Of the thirty-six, one third were not even aware that Cyclospasmol had been prescribed for them. Of the other twenty-four, only twelve spontaneously identified the blue or blue and red generic capsules as Cyclospasmol. The remaining twelve who did not at first say the capsules were Cyclospasmol were then given a card listing ten names of drugs including Cyclospasmol (but not cyclandelate), and finally identified the capsules as Cyclospasmol.

The court finds significant not how many patients named Cyclospasmol but how few did. All of them had been prescribed the Cyclospasmol brand. All of them took only that brand. The survey did not indicate that any of them had ever heard any other name for the drug. Yet only twelve people, a third of the entire sample, could without prompting associate the word Cyclospasmol with capsules of colors identical to those of Ives. Moreover, as to those twelve there was no evidence that they supposed that Cyclospasmol was a brand name or indicated the source of the drug.

Ives argues that because "Cyclospasmol" is a trademark which only it can use, a patient who identifies a cyclandelate capsule as "Cyclospasmol" is necessarily indicating that he believes the drug comes from a single source. But even as to the trademark itself we must "remember that relief always depends upon the idea that no man shall be allowed to mislead people into supposing that his goods are the plaintiff's, and that there can be no right or remedy until plaintiff can show that at least presumptively this will result." *Bayer Co. v. United Drug Co.*, 272 F. 505, 509–510 (S.D.N.Y. 1921) (L. Hand, J.).

No doubt to physicians and pharmacists the word "Cyclospasmol" signifies a source. But there is no reason to suppose this is so as to patients. They have not been the target of the sales campaigns, and they play no role in choosing what drug to buy. Nothing in the record suggests that they "understand by the word anything more than a kind of drug to which for one reason or another they [have] become habituated." *Id.* at 510. Such patients as read their prescriptions do not attribute to Cyclospasmol "any other meaning than as an ingredient in a general compound, to which faith and science might impart therapeutic virtue." *Id.*

Thus, one cannot infer from the fact that patients recognize the name Cyclospasmol that they appreciate that the drug they receive comes from a single source. If they do not know that the word designates a single source, it follows that a color they associate with the name does not signify to them a single source and cannot acquire a secondary meaning.

No doubt one can imagine circumstances under which a patient believes the word Cyclospasmol to be a brand name and therefore associates the colors with one source. For example, a doctor or druggist might explain to the patient that Cyclospasmol is one brand of cyclandelate. For that patient the blue and blue and red colors may perhaps attain a secondary meaning. But Ives did not offer proof that any patient received some such explanation from a physician or a pharmacist. More importantly, no question in the survey was designed to show whether patients supposed that Cyclospasmol emanated from a single, although unidentified, source.

Ives claims that the interest of patients in receiving the very drug prescribed by their doctor will not be adequately protected unless Ives has a monopoly over the colors. Implicit in this argument is the contention that even if Ives cannot show secondary meaning it is entitled to exclusive use of its capsule colors because there is no other way to identify its product to its ultimate consumers. However, the Lanham Act does not purport to confer "property rights", but, as noted, only to prohibit a "false description or representation" of a product. Since Ives did not show that the blue and blue and red capsule colors had acquired a secondary meaning, there was no "false description or representation".

For this reason, the fact that defendants intentionally duplicated the blue and blue and red colors does not prove the existence of secondary meaning. Unless the colors bespeak the source of the capsules, defendants have every right to imitate them. As Justice Brandeis said in *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L.Ed. 73 (1938), "Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested."

Ives' failure of proof highlights the difficulty of proving secondary meaning to consumers in the prescription drug market. In urging that Section 43(a) of the Lanham Act be read to grant Ives a perpetual monopoly over the blue and blue and red colors, Ives cites cases involving both prescription drugs and ordinary goods sold over the counter. But decisions concerning goods which the seller promotes directly to the consumer cannot indiscriminately be used as authority in a case concerning prescription drugs. Where the advertising and promotion are aimed at the customers who make the choice of which product to buy, they may indeed take a non-functional feature to indicate not merely the product but also the producer. In that case, vast expenditures for advertising may suggest that the advertising was successful in implanting in the minds of the consumer the idea

that certain features by which the product is promoted identify its source. But extensive promotion to physicians does not establish that they have passed along to their patients any message as to source. For that reason secondary meaning will perhaps be difficult to establish in those prescription drug cases where the patient never sees the manufacturer's packaging. Here Ives certainly did not establish secondary meaning.

The court concludes that Ives has not made out a violation of Section 43(a) of the Lanham Act.

## V

■ Little need be added to the discussion in the prior opinions of Ives' claims under New York law. *See* 455 F.Supp. at 951; 601 F.2d at 644. Ives contends primarily that whether or not the blue and blue and red colors have acquired a secondary meaning and thus constitute a false representation, the New York law of unfair competition should be construed to protect patients by making it easy for them to detect instances in which the pharmacist has made an improper substitution of the generic for the brand name drug.

Assuming that this contention is not foreclosed by *Sears, Roebuck & Co. v. Stiffel Company*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 87 S.Ct. 779, 11 L.Ed.2d 669 (1964), this interest of the patients must be weighed against the policy expressed in the New York Education Law to encourage legal substitution of lower priced drugs. One of Ives' witnesses testified that improper substitution is rare, and Ives showed only a few instances of it. This infrequency may be explained in part by the fact that illegal substitution is subject to both civil and criminal penalties under New York law. To require different capsule colors might to some small extent deter a wrongdoer but it would also severely inhibit legal substitution which the legislature deems to be in the public interest. When the competitive injury which an injunction would cause to defendants is

added to the balance, the patients' ease in detecting a potential improper substitution is outweighed by the interest in fostering the use of generic substitutes.

### VI

The foregoing constitutes the court's findings of fact and conclusions of law. Plaintiff may have judgment permanently enjoining Sherry from using the word "Spasmol". Otherwise the complaint is dismissed. So ordered.