**AMERICAN HOME PRODUCTS CORPORATION, Plaintiff,**

v.

**CHELSEA LABORATORIES, INC. and Zenith Laboratories, Inc., Defendants.**

Civ. No. 81–3351.

United States District Court,
D. New Jersey.

Aug. 5, 1982.*

Meyner & Landis by William Fiore, Newark, N.J., Attys.; Cooper, Dunham, Clark, Griffin & Moran by Marie V. Driscoll, New York City and Steven J. Baron, New York City, Of Counsel, for plaintiff.

Siegel & Barz by Shelley Siegel, Montclair, N.J., Attys.; Salon, Marrow, Dyckman, Killman & Trager by Robert W. Marrow, New York City, of counsel, for defendant Chelsea.

Ribis, McCluskey & Sweeney by Nicholas L. Ribis, Short Hills, N.J., Attys.; Amster, Rothstein & Engelberg by Alfred B. Engelberg, New York City, of counsel, for defendant Zenith.

MEMORANDUM

BIUNNO, Senior District Judge.

This suit involves the manufacture and sale of a prescription medication called "conjugated estrogens" in the U.S. Pharmocopeia (U.S.P.), which plaintiff markets under the registered trademark "PREMARIN", in pumpkin-seed or oval shaped tablets of four dosages, each in a different color, see *Biocraft v. Merck,* 532 F.Supp. 1068 (D.C.D.N.J.1980).

The defendants are "generic drug" manufacturers who also make "conjugated estrogens", and who use the same trade dress, i.e., the same dosages in the same sizes, shapes and colors as plaintiff's product, which is sold by its Ayerst Division.

The case came before the court on application for preliminary injunction, with supporting affidavits and proofs. Some defendants arranged for document requests and other discovery which postponed the hearing with the stipulation that the time so consumed would not be claimed against plaintiff as an element of delay. The same principle applies for time that has passed while numerous post-hearing submissions were made and because *curia advisare vult.*

The complaint is in four counts. Count I charges violation of § 43(a) of the Lanham Act [15 U.S.C. § 1125(a)] by false representation of defendants' products and by false designation of origin.

Count II charges violation of § 32 of the Lanham Act [15 U.S.C. § 1114], through contributory infringement in that defendants are alleged to have willfully placed in the hands of pharmacists products which they should reasonably have anticipated

* Affirmed by Judgment Orders, in Nos. 83–5006 and 83–5828, dated September 29, 1983, U.S. Court of Appeals for the Third Circuit. And see *Ciba-Geigy,* 719 F.2d 56 (3d Cir. 1983), footnote 1 at p. 57.

would be passed off as plaintiff's brand "PREMARIN".

Count III charges unfair competition under State law.

Count IV charges that defendants' products are not equivalent in composition, and hence not substitutes, for plaintiff's "PREMARIN", so that their sale as substitutes or equivalents amounts to unfair competition with plaintiff under § 43(a) of the Lanham Act [15 U.S.C. § 1125(a)].

Plaintiff holds two trademark registrations for "PREMARIN", No. 397,925, registered September 29, 1942 for use on "pharmaceutical preparations for the treatment of ovarian deficiencies", and No. 412,696, registered March 20, 1945, for use on "pharmaceutical preparations containing estrogens". There is no fact issue raised by any party defendant about the registration, validity, subsistence or ownership of these registrations.

The subject matter is somewhat different than for other cases of this kind in that the medication involved is biological product manufactured by pregnant mares and recovered from their urine during the 3rd to 9th months of their pregnancies. The major components, as described in the U.S.P., are estrone and equilin, both in the form of the sodium salts of their sulfate esters. Other components are 17 alpha-dihydroequilin, and smaller amounts of 17 beta-dihydroequilin, 17 alpha-and 17 beta-estradiol, delta 8, 9-dehydroestrone, equilenin, and 17 alpha- and beta-dihydroequilenin.

To the layman, these substances are of a nature like that of organic foods, separated and purified from a natural biological feedstock.

The U.S.P. standard of purity and strength is rather broad compared to most. For a given labelled amount, the total of conjugated estrogens may vary from 90% to 110% of the specified quantity. The estrone component may not be less than 50%, nor more than 65% of the total, and the equilin component may be not less than 20% and not more than 35% of the total. The total conjugated estrogen content, as noted, may

well include some of the estrogen components other than the sodium salts of the sulfate esters of the two major estrogens, estrone and equilin.

The plaintiff's affidavits show, without serious contradiction, that Ayerst "PREMARIN" is prepared in a fashion that maintains the quantities and levels to stricter, narrower and more uniform limits than the U.S.P. standard allows.

As observed in the discussion of the nature of U.S.P. in *United States v. An Article of Drug—Ova II,* 414 F.Supp. 660 (D.C. D.N.J.1975), aff'd 535 F.2d 1248 (3d Cir. 1976), a particular product may barely satisfy the specified minimums, yet will be entitled to be labelled lawfully as "U.S.P.". If the same product meets the higher and stricter standards for a reagent chemical (R.C.) it will necessarily satisfy U.S.P. requirements and more.

As plaintiff's proofs establish without contradiction, "PREMARIN" is prepared to a higher level of precision and a greater degree of uniformity as a result, than U.S.P. specifies. This additional care and effort necessarily implies that dosage administered will be closer to the physician's intention than if the medication were allowed to vary within the entire range of the U.S.P. limits which, as noted, are rather broad.

The breadth of the allowed range is no doubt a recognition of the fact that the composition of the urine of a pregnant mare will vary, not only from mare to mare or from month to month, but also according to the nature and aggregate of foodstuffs and fluids ingested, the metabolic processes within each animal, and other inevitable variations.

Plaintiff levels out and neutralizes these variations by assay of the materials followed by blending of one with another in order to stay within a narrower range and at a more uniform level for the medicinal ingredients involved.

In effect, what Ayerst says is that its "conjugated estrogens", sold as "PREMARIN", is a medication of more uniformity as

to purity and strength than the products marketed by defendants, even though they may be lawfully claimed to meet U.S.P. standards.

The difference may be analogized to the difference between 24K gold and 23K gold, or between silver that is 99.9% pure to that which is 95% pure. In both cases the precious metal is "gold" or "silver", but in each case one sample is purer and more uniform than the other.

The higher degree of purity and uniformity is accompanied by an inevitable cost. The less precisely prepared products, even though entitled to be labelled with the same U.S.P. grade, are not entitled to be substituted, as though fungible, for the "PREMARIN" product, any more than 23K gold can be sold as 24K gold.

There is no claim, of course, that any defendant copies the registered trademark "PREMARIN" directly. The claim is that by copying every physical feature distinguishable by the human senses, such as size, shape and color, the defendants have made their product "look like" plaintiff's though in fact they are different.

No defendant denies that its product copies the PREMARIN trade dress as to color, size, shape and finish. Rather, their position is that it is industry practice to duplicate the trade dress of the innovator or market leader of a prescription drug. The court has no doubt that this is a practice that is engaged in, but the practice is one engaged in by those who enter the field to compete with an established manufacturer, and even then it is not an invariable practice to do so, as the evidence submitted discloses a number of instances where the trade dress was not copied. The posture taken by defendants in this regard does not address the questions presented other than to admit facts that can hardly be denied. The question is whether there has been counterfeiting. If the trade dress were as different as possible, the usual requirement for one entering the field to compete with an established product, the inquiry ends there. But when the trade dress is essentially identical, as it is here, that fact establishes an essential element of the claim, rather than a defense. A counterfeiter can hardly be considered to answer the charge by proving that all counterfeiters have an industry practice to duplicate the genuine article.

Prescription drugs present some aspects that are unique to them because of their nature. The structure of the system that has developed over many years involves interrelated activities and functions as between manufacturer, pharmacy, physician and patient. The major relationship in this structure is that of the physician and patient. It is the physician who is told of the ailment, who takes the history, conducts an examination and perhaps appropriate tests, and makes a diagnosis. Although there may be a great many individuals with like ailments, each examination and diagnosis is unique and individual. This is because the selection of therapy or treatment, which may involve prescribing a given medication, must take into account not only the particular ailment but also other conditions about the patient which may rule out a therapy or a prescription that might otherwise be indicated. As anyone who has had occasion to examine the Physician's Desk Reference knows, there is hardly a prescription medication whose detailed description does not mention one or another contra-indication. Neither medicine nor pharmacy has reached that stage of perfection where a given medication can be prescribed without giving close attention to other conditions of the patient.

Once the professional judgment of the physician has been exercised and a prescription written, the other elements of the structure are activated. The prescription goes to a pharmacist whose function it is to supply the patient with the medication that the doctor ordered. His stock or inventory, in turn, is obtained from manufacturers.

Whatever the perceived social value of drug substitution laws may be from an economic standpoint, there can be no doubt that the prime duty of the supply elements of the structure is to support the physician

in the treatment of the patient. The whole structure exists for this major purpose.

Courses of conduct that make it possible or feasible for a manufacturer or pharmacist to fill a prescription with a medication other than that which the doctor ordered, and to give as little indication as possible that a substitution was made (as by copying trade dress) cannot stand very high on the scale of values. It ranks with selling imitations on the silent pretense that they are genuine. Such courses of conduct ease the passing off of goods.

It is one thing to pass off one fungible article for another. That sort of conduct damages manufacturers whose goods go unsold because another's were supplied in their place. In the field of prescription medications that injury is far outweighed by the risk that the patient may be harmed by an unsuited drug over whose identity and quality the genuine maker has no control. From a public interest point of view, the risk of harm to the patient stands highest on the scale.

In most cases of this kind involving prescription medications, a common issue raised is that the association between trade dress and the tradename—the identification of source—is by sales personnel or detailmen whose activities are with pharmacies or physicians, rather than with the patient. Even so, the uniqueness of the trade dress coupled with long usage has often been regarded as sufficient to establish secondary meaning. Such evidence is present here, but there is more as well. The moving papers show, without contradiction, that plaintiff has followed the practice of supplying blister cards carrying 7 PREMARIN tablets each (a week's supply) to physicians *for delivery to patients.* The sample card in the exhibit carries the trademark, the color, and other information designed to establish an association in the mind of the patient between the trade dress and the trademark. The proof is that millions of these have been distributed. This evidence, not found in most cases, indicates that plaintiff has a high likelihood of success in establishing secondary meaning in the minds of the patients themselves.

Defendants also argue with vigor that the trade dress is functional rather than a designation of origin, but the evidence in support is weak and not persuasive. It has been pointed out before that trade dress is a legal shorthand term for all the features that make it up. It is not color alone. It is not size and shape alone. It is not finish alone. It is all the features taken together. This is no different than the common experience that while human beings have two eyes, a nose and mouth, two ears, hair, and other facial features, the fact that two persons may have all of them of the same color in no way precludes identifying one as a different person than another. The nose and mouth may be of different sizes and shapes. So may the ears. The eyes may be prominent or sunken. The chin may be dimpled. And so on. Even in the dramatic arts, where the imitation of appearance is a highly developed skill, it is not easy to make one person look exactly like another.

Prescription medications, of course, do not have the number of features to work with as exist in the human face. Yet there are enough colors available, enough kinds of packaging in tablets or capsules or lozenges and the like, and enough shapes, to provide the means for unique trade dress of this kind. As has been observed in other cases, most prescription medications are physically too small to warrant reliance only on what can be very small print, not easily read, of a trademark or manufacturer's name or logo. It is therefore widely used practice to design the trade dress of the medication through every feature available so that secondary meaning can be achieved. An inspection of the Product Identification Section of the Physician's Desk Reference (PDR), where the most widely dispensed medications are shown in color, makes this fact evident.

The law of trademarks and unfair competition applies equally to all kinds of products manufactured and sold in commerce. It applies uniformly whether the product be silverware, hats, cornflakes or prescription

medications. Most articles of commerce are not subject to the kind of thorough and detailed regulation as are prescription medications. These are regulated at the federal level because they are "drugs" and may not be sold in commerce at all unless it is first shown that they are "safe and effective". Under state law, their sale and dispensation is regulated by requiring that prescriptions be issued only by an authorized professional, such as a physician, and dispensed and sold to the patient only by a licensed professional, such as a pharmacist.

There is nothing in these regulatory laws, federal or state, which in any way modifies or reduces the scope of the law of trademarks or unfair competition in the case of prescription medications. A manufacturer of those specialized articles, such as Ayerst, is as much entitled to develop and establish a good will for its prescription medications as is another for entirely different goods. Insofar as trademark infringement and unfair competition are but a species of fraud, there is a strong element of public interest to prevent deception of the consumer by palming off or otherwise. In the case of prescription medications, that public interest aspect is especially strong for obvious reasons.

Because of the nature of the law of most, if not all, jurisdictions in respect to product liability it is of extreme importance to manufacturer and consumer alike that the source of an accused prescription medication be known.

Before the enactment of laws by most states to allow or require the substitution of a "generic drug" for a named brand specified by the prescription, there was not much of a problem on this score. Because pharmacists were not allowed to make substitutions on their own, there was no motive for anyone to engage in the business of manufacturing a "generic drug" product to be sold in the place of a specifically prescribed item.

These state laws, passed since the early 1970's, have taken various forms. Some involve the issuance of formularies, and others do not. Those with formularies are either positive formularies or negative formularies. The formularies are promulgated by state regulatory agencies whose function it is to pass upon the pharmacological, therapeutic and bioavailable equivalence of the generic substitute. As a consequence, a particular generic drug may be substituted in one state but not in another.

The Food and Drug Administration plays an indirect part in the process to the extent that, in deciding whether a generic drug produced by a given manufacturer may be sold at all, it considers these important factors.

The significant point is that in no part of this intense and interrelated regulatory scheme is there any suggestion that trade dress of the prescription medication plays any part in the ultimate determination. Nor is the subject passed in silence. Regulatory agencies at both federal and state levels have taken pains to point out, for the benefit of the consumer, that trade dress features such as color, size, shape, and the like are unrelated to the equivalency of the approved generic substitute. They say, in substance, that sugar is sugar, whether it be powdered, granulated, cubed, white, tan or anything else.

For these reasons, the court sees no basis in law for applying the principles of trademark and unfair competition law to prescription medications any less forcefully than it would for other articles of commerce. In fact, because of the dangers implicit from the use of prescription medications that are not present for most other articles of commerce, the factual circumstances warrant closer scrutiny of the interests of the parties and of the public.

Precisely what the constraints are in the way of advertising directly to the public in this category of articles is not entirely clear. If they are regulatory, then it would seem that the extension of First Amendment protection to commercial speech that began with *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) and continued through *Central Hudson Gas v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct.

2343, 65 L.Ed.2d 341 (1980) and *In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) could well open the door to institutional advertising to the general public that will truthfully inform it about the significance of brand names, of trade dress, and the like, and their relationship to lawful generic substitution. Such a course could go far to educate the public, the group best equipped to make choices when it is well informed.

The issue most vigorously pressed by defendants is the matter of laches, abandonment and the like. The evidence is that Ayerst has known of the market existence of generic substitutes in imitation trade dress for some years. It has obtained samples of them, conducted assays of them in its laboratories, and has presented the results to FDA showing that one or another failed to pass one or another assay specified by U.S.P. It has developed what it believes are more sensitive or more accurate laboratory tests and has presented these as well to FDA and to the suitable committees of U.S.P. for consideration. It has also brought to the attention of FDA a possible ambiguity under which "conjugated estrogens" may be regarded as meeting U.S.P. specifications even though some of the active ingredients are not natural substances derived from the urine of pregnant mares, but are synthesized materials. A related kind of medication prepared by synthesis, is listed as an article in U.S.P. under the generic name "esterified estrogens". The evidence indicates that the natural and synthetic articles are not the same chemically or therapeutically, and it is clear that one cannot be substituted for the other under the various state substitution laws.

Defendants, in fact, have submitted after hearing a draft proposal by a committee of USP which suggests that the present separate definitions for "conjugated estrogens" and "esterified estrogens" be eliminated, and that both kinds of article be described in a single article. The proposal has not, of course, been adopted and the court cannot regard it as though it were, but the making of it displays the complexity of the subject and underscores the importance of seeking enforcement of unique trade dress as a method for establishing source.

As mentioned elsewhere in this opinion, the complications created by a failure to identify source and origin in products liability cases are especially enormous for prescription medications. Two recent cases in this court illustrate the magnitude of the problem: *Aarnes v. Merck,* 532 F.Supp. 148 (D.C.D.N.J.1980) and *Pipon v. Burroughs-Wellcome,* 532 F.Supp. 637 (D.C.D.N.J. 1982).

Certainly, no claim of abandonment can be seriously advanced. See 15 U.S.C. § 1127(a), and *Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, at 31, 21 S.Ct. 7, at 11, 45 L.Ed. 60 (1900), along with the many consistent decisions that have followed it. Nothing presented at this stage of the case remotely suggests any intent to abandon either the registered trademarks or the trade dress adopted in association with it.

Nor does the court find any credible evidence of prejudice to defendants due to the delay. In the absence of prejudice, delay is not laches. Rather, the defendants may derive benefit from the delay since delay alone may provide a basis for denying monetary damages for past infringement or unfair competition, but it will not bar injunctive relief to protect the trademark owner and the public from future infringement or unfair competition.

The facts of record at this stage of the case show that the name PREMARIN and the associated trade dress have been used extensively and without variation. The volumes of sales are of entirely different orders of magnitude. Plaintiff is very likely to be able to show that the difference is so large, and its method of putting the trademark and associated trade dress in the hands of the ultimate consumer so extensive, that the secondary meaning thereby achieved has not been significantly diluted at this time.

It must be remembered that the primary application of PREMARIN is for deficiencies associated with the menopause, or which follow it. The therapy indicated is

necessarily of much longer duration than in the case of acute conditions treatable in a matter of a few weeks. At one tablet a day, the therapy for a year involves 365 tablets for a single patient. Hence the number of patients receiving defendants' products is relatively small, numbering in the thousands where plaintiff's number in the millions. See, e.g., *Alfred Dunhill v. Kasser,* 350 F.Supp. 1341 (D.C.D.Pa.1972) and the excellent discussion there. See, also, on the same question, *McNeil Lab. v. Amer. Home Pds.,* 416 F.Supp. 804 (D.C.N.J. 1976). The rule in the New Jersey courts on the state law claim for unfair competition is the same. See *Blue Goose v. Blue Goose,* 110 N.J.Eq. 547, at 551, 160 A. 316 (1931).

Supplemental memoranda have been submitted to the court to discuss *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). While the decision contains useful discussion and references in respect to trademark and unfair competition law, the question considered and decided was one not involved in this case.

In that case a Court of Appeals reversed a district court judgment in favor of defendants after trial. The trial court had found no evidence to support a claim of contributory infringement under § 32 of the Lanham Act. The Court of Appeals reversed, concluding that the defendants had violated § 32 of the Lanham Act, but without discussing or dealing with other claims made under § 43(a) of the Lanham Act or unfair competition under New York law.

The Supreme Court reversed, on the narrow ground that under F.R.Civ.P. 52(a), the fact findings of the District Court were binding on the Court of Appeals unless "clearly erroneous". In analyzing the Court of Appeals decision, the Supreme Court regarded it as indicating no more than that certain evidence of mislabeling by pharmacists was entitled to more weight than the district court gave it, and since the district judge's findings in that regard were

not "clearly erroneous", they should not have been disturbed.

The concurring opinion of Justice White indicates that certiorari had been granted on a different question, i.e., whether the Court of Appeals had applied the correct legal standard in finding a generic drug manufacturer liable vicariously under § 32 of the Lanham Act for direct infringement by pharmacists who dispensed the generic drug. This aspect of the case there evidently arises because of the last part of § 32(1), which provides that:

"Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake or to deceive."

That question turned out not to be involved, as the court concluded that the Court of Appeals had not applied an incorrect standard, see footnote 13 of the opinion. Instead, the court found error in failing to apply the "clearly erroneous" standard of F.R.Civ.P. 52(a). Thus, the case is of no application here.

The findings of fact and conclusions of law made here are grounded on Counts I, III and IV, which involve the broader scope of § 43(a) of the Lanham Act and unfair competition under state law. While evidence of mislabeling by pharmacists was included in the moving papers, the court has not considered it in connection with Count II, which charges violation of § 32 of the Lanham Act by contributory infringement.

In fact, under present federal law as discussed in *Inwood,* a manufacturer would be hard put to show that a generic drug manufacturer in fact intentionally induced pharmacists to mislabel the generic drugs, or continued to supply their substitute to pharmacists whom they knew were mislabeling it. Although such mislabeling by the pharmacist clearly violates § 32 of the Lanham Act, see *Inwood,* footnote 14, the proofs in this case as presented by the defendant manufacturers is that their sales are to

wholesalers and distributors. They do not employ sales people or detailmen to visit pharmacies, and so it may well be fruitless to explore for the existence of correspondence, conversation and the like as evidence of intentional inducement or of knowledge of mislabeling. Whether intentional inducement can be shown successfully by other kinds of evidence, or rational inferences therefrom, is a question that must await discovery before trial.

In any event, defendants have been made aware by the proofs in the moving papers and by testimony and exhibits, that not only have prescriptions been filled with generic substitutes with the trademark "PREMARIN" put on the bottle, but that in some cases an Ayerst insert was placed in the bottle filled with the substitute. This is especially egregious misconduct, not only from the usual "passing off" standpoint but even more so because the Ayerst product and its insert are authorized to be sold for osteoporosis, an ailment not mentioned on defendants' inserts and for which they evidently do not have FDA clearance.

It is also worth observing that there is evidence in the case showing that in a number of states substitution of the generic drug is not allowed at all. No doubt the defendants' products may be sold in those states if the prescription calls for it, but they may not be sold in substitution. Discovery may reveal how defendants deal with this aspect of the subject in view of the fact that their sales are to wholesalers and distributors who may resell the product anywhere.

In review of what has been examined and considered, the material pertinent to the major elements to be considered are summarized as follows:

A. *Likelihood of success on the merits.* For the claims on Counts I, III and IV, which involve § 43(a) of the Lanham Act and unfair competition under state law, the governing principles are much the same, see *Q-Tips v. Johnson and Johnson,* 206 F.2d 144 (3rd Cir.1953); *Johnson & Johnson v. Colgate-Palmolive,* 345 F.Supp. 1216 (D.N.J. 1972), and the likelihood of eventual success is evaluated to be very high. The trade dress adopted for PREMARIN, which includes features of shape, size, finish and color, is arbitrary and non-functional, and the evidence provided so far indicates a very high likelihood of showing secondary meaning, not only in pharmacists and physicians but in the ultimate consumer—the patient—who is the focus of the entire effort. This is especially so because of plaintiff's use of blister cards with starter sets which enable the physician to dispense a week's supply on the spot while an initial prescription is filled. The blister card is strongly capable of associating the trade dress features with both the Ayerst and Premarin names, and of course that association continues with the trade dress of the product in the prescription that follows the starter set. Millions of these have been distributed.

B. *Irreparable harm.* So far as injunctive relief is concerned, the facts show fully the typical elements. The evidence indicates that there will be great difficulty at trial in establishing actual identity and parentage of the various competing brands. Their own printed inserts raise question marks about where the active ingredient is made and by whom, where they are made up into tablets and so on. It may well turn out that they come from a single source, or maybe two, despite the multiple names. The record of vial labelling on the sample purchases shows the use of PREMARIN put on the label altogether too often when something else is inside, thus raising a serious risk of exposure for unwarranted product liability suits, especially since none of defendants' products matches the narrow range and uniform controls employed for PREMARIN.

C. *The Balance of Equities.* Defendants have made no serious attempt to contradict plaintiff's evidence, though the argument has been rigorous in accordance with the traditional inverse rule.

As in other cases, reported and unreported, the plaintiff's product was well-established and of high repute, and it was copied just as closely as it could be except for two

things: (a) no one printed the trade name PREMARIN on the tablet itself (although it is displayed all over the catalogs with the word "compare" or "similar") and (b) the content and quality control was far from matched. The copying was clearly deliberate. Defendants are entitled to compete with plaintiff in the market for conjugated estrogens U.S.P., but they will have to do it on their merits, not by unfair means.

D. *The Public Interest.* This element is especially strong in prescription drug cases. Its importance may vary from case to case according to the circumstances but it is never of slight importance. The consuming public consults and expects to be treated by skilled physicians, not by witch doctors, and they are entitled to have their prescriptions filled by professional pharmacists, not by sorcerers' apprentices. The Court of Appeals for this circuit perceptively disposed of the quackery of color when it decided *U.S. v. Ghadiali,* 165 F.2d 957 (3d Cir.1948).

The exhibits in evidence indicate that in many, if not most, of the states with generic drug laws, substitutions cannot be made for the medication involved here. The FDA itself has designated it as one where the official definition in U.S.P. is too broad for F.D.A. to be able to say that one make can be substituted for another. The FDA's work is designed to protect the public interest and preliminary relief will support it.

For all of the foregoing reasons, the court is of the view that preliminary injunction is warranted. Lack of information makes it impossible at this time to specify the provisions and a further hearing in that regard will be needed, although some aspects are obvious. For example, those defendants still in the case who have not marketed a given dosage can be restrained promptly from doing so with a copied trade dress.

The court will need as much detail as can be gathered promptly to assist it in shaping the order. Defendants Cord and ICN have consented to permanent injunctions and are out of the case. The proofs were that one or the other (or both) supplied Kalipharma (formerly Pure Pac); does Kalipharma have a new source of supply? Is such new source one of the other remaining defendants, Chelsea or Zenith?

What is the present inventory (both as put up in bottles or as in bins, etc.), dosage by dosage, of Chelsea and Zenith? What are the monthly production figures? How long would it take to change to a different shape and size of tablet die? To a capsule? To change colors?

This information may be presented to the court under seal for the time being and without disclosure to plaintiff or to each other. Defendants may offer other data pertinent to the matter of the terms of the order as they desire.

The submissions should be made as promptly as feasible so that the court can set a date for hearing.